Filed 6/17/25  T&R Painting and Drywall v. Town Building & Development CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| T&R PAINTING AND DRYWALL,<br><br>　　Plaintiff and Appellant,<br><br>v.<br><br>TOWN BUILDING & DEVELOPMENT,<br><br>　　Defendant and Respondent. | 2d Civ. Nos. B330375, B333007<br>(Super. Ct. No. 56-2019-00525158-CU-BC-VTA)<br>(Ventura County) |

Appellant T&R Painting and Drywall (T&R) appeals from the judgment after the trial court granted Town Building & Development (TBD)'s motion for judgment notwithstanding the verdict (JNOV) and ordered T&R to pay costs and attorney fees.[1] We affirm.

---

[1] T&R filed appeal number B330375 after the order granting JNOV and appeal number B333007 after the order granting costs and fees.  We granted the order consolidating the two appeals.

FACTS AND PROCEDURAL HISTORY

TBD is a general contractor hired to manage the build-out of two single family residences. In November 2017, TBD hired subcontractor T&R to install drywall and paint the two residences (the Project). The parties entered into a drywall contract in which T&R agreed to install drywall for $52,440. The parties also entered into a painting contract in which T&R agreed to paint the residences for $13,185.

T&R began the drywall installation in May 2018. In October 2018, TBD was dissatisfied with T&R's progress and sent T&R a 48-hour notice to perform. The notice required T&R to have a crew of four painters within 48 hours and remain on the job until the exterior painting was completed. T&R did not perform as required by the notice. TBD hired other contractors to repair, redo, and complete the drywall installation and painting.

T&R sued TBD[2] for breach of contract and quantum meruit, seeking payment for the work T&R performed. T&R alleged in its complaint that it was a licensed subcontractor for drywall and painting services. TBD filed a cross-complaint for breach of contract, alleging $56,205 in damages as a result of T&R's failure to perform. The trial court later granted TBD's request to dismiss its cross-complaint.

After T&R presented its case-in-chief, TBD moved for nonsuit on the ground that T&R did not comply with the Contractors State License Law (Bus. & Prof. Code,[3] § 7000 et

_____

[2] T&R sued other parties but later dismissed those claims. They are not parties to this appeal.

[3] Further unspecified statutory references are to the Business and Professions Code.

2

seq.; CSLL) because its registered managing officer (RMO), Hagai Rapaport, did not exercise direct supervision and control over T&R's work on the Project. (§§ 7031, subd. (a), 7068,[4] and former § 7068.1; Stats. 2013, ch. 180, § 1.) The trial court denied the motion without prejudice. It denied the motion because it was based on Rapaport's deposition testimony. The court asked T&R if it was asking to "reopen" its case-in-chief. Its counsel said, "I'm not asking to reopen."

The jury found in favor of T&R on its breach of contract claim. The jury awarded T&R $24,777.90 for damages under the drywall contract and $4,121.84 for damages under the painting contract.

TBD moved for JNOV, contending T&R was barred from recovering damages because it "acted as an unlicensed contractor as its RMO [Rapaport] did not exercise direct supervision and control over [T&R]'s work required under [the contracts]." The trial court granted the motion, finding there was no substantial evidence "that T&R's RMO exercised direct supervision and control of the work." T&R unsuccessfully moved for reconsideration.

Each party filed a memorandum of costs and moved to tax each other's costs. The trial court granted TBD's motion and denied T&R's motion. It later awarded TBD $24,396.06 in costs and $226,400 in attorney fees.

---

[4] Section 7031 was amended in 2021, but the amendment did not change the substance of the statute. (Stats. 2020, ch. 312, § 56.) Section 7068 was amended in 2022, but the amendments are not relevant to the issues in this appeal. (Stats. 2021, ch. 376, § 5.)

## DISCUSSION
### *JNOV*

T&R contends the trial court erred in granting the JNOV because (1) TBD forfeited the argument by failing to request jury instructions on the RMO issue, (2) the court misinterpreted former section 7068.1, and (3) substantial evidence supports a finding that Rapaport fulfilled his RMO duties. We disagree.

### *1. Legal standards for JNOV*

The trial court, "either of its own motion . . . or on motion of a party against whom a verdict has been rendered, shall render judgment in favor of the aggrieved party notwithstanding the verdict whenever a motion for a directed verdict for the aggrieved party should have been granted had a previous motion been made." (Code Civ. Proc., § 629, subd. (a).) "The trial judge cannot weigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. [Citations.] 'A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.' [Citation.]" (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110.)

### *2. CSLL*

Generally, regardless of the merits of their claim, a contractor may not bring or maintain an action to recover compensation for the performance of any act or contract unless they were duly licensed at all times during the performance of that contract. (§ 7031, subd. (a); *Kim v. TWA Construction, Inc.*

4

(2022) 78 Cal.App.5th 808, 823 (*Kim*).)  The purpose of the license laws "is to protect the public from incompetence and dishonesty in those who provide building and construction services. [Citation.]  The licensing requirements provide minimal assurance that all persons offering such services in California have the requisite skill and character, understand applicable local laws and codes, and know the rudiments of administering a contracting business. [¶]  Section 7031 advances this purpose by withholding judicial aid from those who seek compensation for unlicensed contract work.  The obvious statutory intent is to discourage persons who have failed to comply with the licensing law from offering or providing their unlicensed services for pay. [¶] Because of the strength and clarity of this policy, it is well settled that section 7031 applies despite injustice to the unlicensed contractor.  'Section 7031 represents a legislative determination that the importance of deterring unlicensed persons from engaging in the contracting business *outweighs any harshness between the parties,* and that such deterrence can best be realized by denying violators the right to maintain any action for compensation in the courts of this state.  [Citation.] . . .' [Citations.]" (*Hydrotech Systems, Ltd. v. Oasis Waterpark* (1991) 52 Cal.3d 988, 995 (*Hydrotech*).)

The Contractors State License Board (the Board) has the authority to grant licenses to individuals and business entities. The Board shall require the license applicant "to show the degree of knowledge and experience in the classification applied for, and the general knowledge of the building, safety, health, and lien laws of the state and of the administrative principles of the contracting business that the board deems necessary for the safety and protection of the public." (§ 7068, subd. (a).)  If a corporation applies for a license, it qualifies "by the appearance of

5

a responsible managing officer [(RMO)] or responsible managing employee [(RME)] who is qualified for the same license classification as the classification being applied for." (*Id*., subd. (b)(3).)

Section 7068.1 sets forth the responsibilities of the qualifying individual—the RMO or RME. Section 7068.1 was amended in 2022, after the parties here contracted and the alleged breach of contract occurred, but before trial and posttrial motions. (Assem. Bill No. 830 (2021–2022 Reg. Sess.); Stats. 2021, ch. 376, § 6.) It was again amended in 2025 after judgment. (Sen. Bill No. 1455 (2023–2024 Reg. Sess.); Stats. 2024, ch. 485, § 8.) The trial court analyzed the former version of the statute that was in effect at the time of the contract and alleged breach, and T&R analyzes the same version of the statute in its briefs. We do, too. (See generally *Mathews v. Happy Valley Conference Center, Inc.* (2019) 43 Cal.App.5th 236, 261 [applicable version of a statute is the one in effect at the time of the dispute].)

Under former section 7068.1, the RMO or RME shall be responsible for exercising "that direct supervision and control of [their] employer's or principal's construction operations to secure compliance with this chapter and the rules and regulations of the board." (Former § 7068.1, subd. (a); Stats. 2013, ch. 180, § 1.) Use of a license without RMO or RME compliance is essentially the same as if the corporation was unlicensed. (*Buzgheia v. Leasco Sierra Grove* (1997) 60 Cal.App.4th 374, 386–387 (*Buzgheia*).)

### 3. *Forfeiture*

T&R contends TBD forfeited its theory that T&R used a license without RMO compliance by not requesting a special jury verdict on that theory at trial. We disagree. TBD was not

6

required to request a special verdict to proceed with its JNOV motion.

To recover compensation for work performed, a plaintiff contractor must allege in their complaint that they were properly licensed in order to bring or maintain the action. (§ 7031, subd. (a).) If proper licensure is controverted, the burden to prove proper licensure is on the licensee. (*Id.*, subd. (d); *Buzgheia, supra*, 60 Cal.App.4th at pp. 389–393.) If the plaintiff contractor fails to meet this burden, the trial court could grant a motion for directed verdict in favor of the defendant if such a motion was raised. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 629–630 [a directed verdict may be granted when there is no evidence of sufficient substantiality to support the claim]; see e.g., *WSS Industrial Construction, Inc. v. Great West Contractors, Inc.* (2008) 162 Cal.App.4th 581, 596 [nonsuit should have been granted where plaintiff did not prove proper licensing at time of contract].)

Here, the trial court was permitted to grant the JNOV on the licensing issue. (Code Civ. Proc., § 629, subd. (a) [JNOV shall be granted where a directed verdict should have been granted if a previous motion was raised]; *Beavers v. Allstate Ins. Co.* (1990) 225 Cal.App.3d 310, 327 [a trial court's power to grant a nonsuit, to direct a verdict, or to grant a motion for JNOV, are merely different aspects of the same judicial function and are governed by the same rules].) T&R relies on *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 674 and *Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1534–1535, to argue that the trial court must review the sufficiency of evidence of a verdict based on a rule of law on which the jury was instructed. But these cases do not speak directly to a trial court's power to grant a JNOV, nor do they involve section 7031, which "bars all actions,

7

regardless of the equities . . ., which effectively seek 'compensation' for illegal unlicensed contract work."  (*Kim*, *supra*, 78 Cal.App.5th at p. 824.)

To the extent T&R contends the trial court specifically found that TBD forfeited its right to claim error in the instructions or special verdict form, the record reflects otherwise. The trial court stated, "The court *does not understand the moving papers to assert either that the court erred in instructing the jury or that the jury was provided deficient special verdict forms. . . .* However, when the evidence would support only one finding as a matter of law, no jury instruction or jury-finding is required. Consequently, if, as the court will find, the record contains no evidence that would permit a finding of the RMO's supervision and control, *that issue* would not be forfeited."  (Italics added.) We conclude there was no forfeiture.

### 4. *Interpretation of former section 7068.1*

Notwithstanding the parties' stipulation that T&R was licensed to perform drywall and painting services and that Rapaport was its "registered managing officer," T&R bore the burden of proving that Rapaport executed his RMO duties in compliance with former section 7068.1, subdivision (a). (*Buzgheia*, *supra*, 60 Cal.App.4th at p. 393 ["As the contractor seeking compensation, Buzgheia retained the burden of proving due licensure, which included the burden of proving compliance with the RME requirements.  Neither possession of a facially valid license nor the failure of the Board to act against the license removed this burden from his shoulders"].)

Former section 7068.1 provides that an RMO "shall be responsible for exercising that direct supervision and control of [their] employer's or principal's construction operations to secure compliance with this chapter and the rules and regulations of the

8

board." (Stats. 2013, ch. 180, § 1.) T&R contends the court misinterpreted the statute to require T&R's RMO to exercise "direct supervision and control" over the Project. Instead, T&R asserts this language contemplates "supervision and control" of "overall construction operations" on a "high corporate-wide level," not the "minutiae" of an individual project. (Italics omitted.) We are not persuaded.

We review issues of statutory interpretation de novo. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 527.) " 'As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.' [Citation.] 'We begin by examining the statutory language, giving it a plain and commonsense meaning. [Citation.] We do not, however, consider the statutory language in isolation; rather, we look to the entire substance of the statutes in order to determine their scope and purposes. [Citation.] That is, we construe the words in question in context, keeping in mind the statutes' nature and obvious purposes. [Citation.] We must harmonize the various parts of the enactments by considering them in the context of the statutory [framework] as a whole. [Citation.] If the statutory language is unambiguous, then its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history.' [Citation.]" (*Skidgel v. California Unemployment Ins. Appeals Bd.* (2021) 12 Cal.5th 1, 14.)

Former section 7068.1 does not define "direct supervision and control." Nor does it define "construction operations." But at the relevant time, the regulation issued by the Board provided that " 'direct supervision and control' includes any one or any

9

combination of the following activities: supervising construction, managing construction activities by making technical and administrative decisions, checking jobs for proper workmanship, or direct supervision on construction job sites." (Former Cal. Code Regs., tit. 16, § 823, subd. (b); see also *Buzgheia*, *supra*, 60 Cal.App.4th at p. 381.) While this litigation was pending, section 7068.1 was amended to now include a similar definition under subdivision (c)(4) of the statute. (§ 7068.1, subd. (c)(4); Stats. 2024, ch. 485, § 8.)

Based on the prior regulation, we conclude former section 7068.1 requires that an RMO be responsible for ensuring construction projects are properly performed. While the regulation does not require an RMO's personal presence at the job site (see *Buzgheia*, *supra*, 60 Cal.App.4th at p. 381), its examples of direct supervision and control contemplate that an RMO will exercise sufficient oversight over construction projects to ensure they are properly performed. In so concluding, we reject T&R's interpretation that "managing construction activities by making technical and administrative decisions" means that an RMO can fulfill their duties by managing the company on a higher corporate-wide level. T&R's interpretation is inconsistent when read in context with the other examples of "direct supervision and control" provided in the regulation. The other examples contemplate oversight of construction projects, including "*supervising* construction," "checking *jobs* for proper workmanship," and "direct supervision on construction *job sites*." (Former Cal. Code Regs., tit. 16, § 823, subd. (b), italics added; see also e.g., *Buzgheia*, at p. 382 [parties offered evidence regarding the RME's work on an individual construction project].)

Read in context, we interpret "managing construction *activities*" to mean "making technical and administrative

10

decisions" with respect to individual construction activities. (Italics added.) For example, that would include administrative staffing decisions on an individual project or technical decisions on the construction aspects of a project (e.g., materials used or size specifications). Because former section 7068.1 requires an RMO to exercise direct supervision and control of construction operations "to secure compliance with [the CSLL] and the rules and regulations of the board," an RMO's oversight over construction projects is necessary to ensure compliance with sections 7031 and 7068.1.

Our interpretation is consistent with the overall objective of the CSLL to protect the public from "incompetence and dishonesty in those who provide building and construction services." (*Hydrotech*, *supra*, 52 Cal.3d at p. 995.) Because the RMO must be "qualified for the same license classification as the classification being applied for" (§ 7068, subd. (b)(3)), they are responsible for ensuring the persons actually performing the work have the "requisite skill and character." (*Hydrotech*, at p. 995.) In our view, an RMO who only exercises a higher corporate-wide level of supervision control over business operations would not ensure that construction work is performed by or under the supervision of a licensed contractor. (See *Buzgheia*, *supra*, 60 Cal.App.4th at p. 384.) This is particularly true here because there were no other licensed contractors directly supervising T&R's construction work in the field. As the RMO, Rapaport was responsible for ensuring the competent and honest performance of construction work on the Project. (*Hydrotech*, at p. 995.)

T&R contends the amendment to section 7068.1 underscores the trial court's misinterpretation of the statute. It asserts the amendment serves to clarify that direct supervision

11

and control can be delegated.  (*Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 922.)  The amended statute codified the Board's regulation defining " '[d]irect supervision or control.' "  (§ 7068.1, subd. (c)(4).)  It also states that the RMO or RME "shall be responsible for exercising supervision and control" and defines " '[s]upervision and control' " as "direct supervision or control or monitoring and being available to assist others to whom direct supervision and control has been delegated."  (§ 7068.1, subds. (a), (c)(3).)

Here, the amendments to section 7068.1 are not inconsistent with our conclusion.  The statute now provides that "supervision and control" is "direct supervision or control or *monitoring and* being available to assist others to whom direct supervision and control has been delegated."  (§ 7068.1, subd. (c)(3), italics added.)  Although the statute now states that direct supervision and control may be delegated to others, in such an instance the RMO is still responsible for "monitoring."  (*Dr. Leevil, LLC v. Westlake Health Care Center* (2018) 6 Cal.5th 474, 479 ["the use of the conjunctive word 'and' to connect the three conditions can only mean that all three conditions must be satisfied"].)  Thus, even under the current statute, an RMO must still exercise some level of oversight over a project by monitoring even where direct supervision and control is delegated to another person.  We conclude the trial court did not err in interpreting former section 7068.1.

### 5.  *Substantial evidence*

T&R contends substantial evidence supports that Rapaport fulfilled his RMO duties under former section 7068.1.  We conclude otherwise.

Our standard of review on appeal is the same as the trial court's.  We determine whether any substantial evidence—

12

contradicted or uncontradicted—supports the jury's verdict. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138.)  We " 'must resolve any conflict in the evidence and draw all reasonable inferences therefrom in favor of the jury's verdict.  [Citation.]' " (*Teitel v. First Los Angeles Bank* (1991) 231 Cal.App.3d 1593, 1603 (*Teitel*).)

We conclude there was not substantial evidence that Rapaport fulfilled his duties as the RMO.  The undisputed evidence, based on Rapaport's trial testimony, established that Rapaport was the president and only RMO at T&R.  He held a painting and drywall license.  Balam Cardenas was the project manager for the Project.  Cardenas was not a Board licensed contractor, and he did not perform any work in the field.

Rapaport did not see or prepare the drywall proposal before the contract was prepared, and he did not know the proposal contained certain key specifications regarding the size of the drywall and finish.  When the 48-hour notice was sent to T&R, Rapaport still had not seen the drywall proposal.  He had not spoken to anyone at T&R regarding its scope of work on the drywall contract including the specifics of the work T&R agreed to do (e.g., type of finish and details about installation).  He did not review the drywall contract before it was signed.  He had no discussion with Cardenas as to the scope of the drywall installation work that was to be performed.

Rapaport also did not visit the Project site nor supervise employee work in the field.  He did not know where the Project was located, what the structure looked like, or if the structures were one or two stories high.  He never spoke with laborers in the field.  Rapaport did not inspect the drywall before the walls were painted.  He did not know what T&R did after it received the 48-hour notice to perform.  He did not know Richard Town, the

13

owner of TBD, when T&R received the 48-hour notice he sent. He did not know if invoices for the Project were sent to TBD. At the time of his deposition, Rapaport did not know a painting proposal was prepared and did not know the scope of the painting job.

T&R highlights evidence of Rapaport's involvement in T&R's daily operations, his technical knowledge of T&R processes for certain business operations such as staffing and creating proposals, and his knowledge of the general construction industry. But as the party with the burden of proving compliance with the RMO requirements (*Buzgheia*, *supra*, 60 Cal.App.4th at p. 393), T&R had to prove compliance with former section 7068.1. As the RMO, Rapaport was thus required to have some level of oversight over T&R's construction work on the Project. A high level of supervision and knowledge of T&R's general business operations was insufficient. And here, where there were no licensed contractors directly supervising T&R's construction work in the field, Rapaport had to demonstrate "direct supervision and control" over the Project to secure compliance with the CSLL and Board rules and regulations. (Former § 7068.1, subd. (a).)

T&R points to the following examples of Rapaport's purported RMO compliance: (1) receiving updates on the Project from Cardenas, (2) discussing emails about the Project with his operations manager, Judith Tejada, (3) reviewing photos of the Project while it was in progress, (4) conversing with Tejeda about a specific problem on the Project regarding the construction mud not reaching the floor, (5) reviewing the 48-hour notice with Tejeda when she received it, (6) delegating job site responsibilities to Cardenas based on his knowledge of Cardena's qualifications and ability, (7) authorizing the accounts receivable department to send a conditional waiver and release as progress

14

payments were received, and (8) receiving information about laborers on the job site from Tejeda.  But these examples were not raised in T&R's opposition to the motion for JNOV below.  "[I]ssues not raised in the trial court will not be considered on appeal."  (*Transcontinental Ins. Co. v. Insurance Co. of the State of Pennsylvania* (2007) 148 Cal.App.4th 1296, 1309.)

But even if we considered this evidence and drew reasonable inferences in the light most favorable to the jury verdict and resolved evidentiary conflicts in T&R's favor (*Teitel*, *supra*, 231 Cal.App.3d at p. 1603), they do not constitute substantial evidence that Rapaport executed his RMO duties in compliance with former section 7068.1.

With respect to Rapaport receiving updates from Cardenas and receiving information about the laborers on the site, there is no evidence regarding the substance of their discussions, frequency, or any actions Rapaport took after receiving such information.  We cannot draw a reasonable inference of direct supervision and control from this evidence.  Regarding the discussion of emails with Tejeda, it is unclear which emails Rapaport is referring to; however, he testified he was not aware of issues with staffing or with communication problems with Cardenas at the time Tejeda received complaints about those issues, and Rapaport did not see the emails that TBD sent regarding a list of items that needed to be completed.  To the extent Rapaport is referring to the emails about the 48-hour notice, which occurred right before the termination of the contract, this evidence does not show Rapaport's involvement in T&R's construction work on the Project when it was performed.

Similarly, there is no evidence that Rapaport reviewed the photos or discussed the mud problem on the Project with Tejeda during performance of the Project.  As to the delegation of job site

15

responsibilities to Cardenas, that fact does not show Rapaport exercised any "direct supervision and control" over the Project. (Former § 7068.1, subd. (a).) Even under the current version of section 7068.1, which expressly permits delegating direct supervision and control to others, an RMO is still responsible for "monitoring." (§ 7068.1, subd. (c)(3).) The evidence here did not show Rapaport monitored or was available to assist Cardenas in his direct supervision and control of T&R's construction work on the Project. Lastly, Rapaport's authorization of one waiver, alone, is not substantial evidence of compliance with his RMO duties under former section 7068.1.

T&R also contends the trial court did not properly construe the evidence in favor of the verdict. We disagree. In considering T&R's evidence, the trial court viewed it "in a light most favorable to the verdict." Contrary to T&R's contention that the trial court should have disregarded all the evidence in favor of TBD as the moving party, the trial court was required to "disregard[] *conflicting* evidence" and view the evidence in the light most favorable to T&R. (*Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 192, italics added.) That is what the trial court did here. We also reject T&R's contention that the trial court drew a negative inference from T&R's evidence. A trial court on a JNOV motion is only required to " 'draw all *reasonable* inferences' " in favor of the plaintiff. (*Teitel*, *supra*, 231 Cal.App.3d at p. 1603, italics added.) As the court noted, it could not "*reasonably* infer" from T&R's evidence that Rapaport was aware of what was happening with the Project at the time the construction work was performed. (Italics added.)

We conclude substantial evidence does not support Rapaport's compliance with his RMO duties. We recognize the harshness of the result here. But where a contractor does not

fulfill their burden of proper licensing, "section 7031 applies despite injustice to the unlicensed contractor." (*Hydrotech*, *supra*, 52 Cal.3d at p. 995.)

*Award of costs and fees*

T&R contends the trial court erred in awarding TBD costs and fees because it did not consider TBD's failure to recover more on its cross-complaint than what T&R offered to settle under Code of Civil Procedure section 998. We conclude there was no error.

T&R made an offer pursuant to Code of Civil Procedure section 998 to settle its complaint with TBD for $34,999. TBD did not accept the offer. About a year later, T&R made a second offer to settle its complaint with TBD and another defendant for $15,001. T&R withdrew the second offer on the same day it was made. T&R also made an offer to settle TBD's cross-complaint for $15,001 in exchange for dismissal with prejudice of the cross-complaint, "a general release of all claims," including a waiver of Civil Code section 1542,[5] and a waiver of all liens, known and unknown. TBD did not accept the offer. The trial court later granted TBD's request for dismissal of its cross-complaint.

Generally, the prevailing party in a civil lawsuit is entitled to recover its litigation costs. (Code Civ. Proc, § 1032.) "However, section 998 establishes a procedure for shifting the costs upon a party's refusal to settle. If the party who prevailed at trial

---

[5] Civil Code section 1542 provides that a "general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in [their] favor at the time of executing the release and that, if known by [them], would have materially affected [their] settlement with the debtor or released party."

17

obtained a judgment less favorable than a pretrial settlement offer submitted by the other party, then the prevailing party may not recover its own postoffer costs and, moreover, must pay its opponent's postoffer costs . . . . (§ 998, subd. (c)(1).)" (*Barella v. Exchange Bank* (2000) 84 Cal.App.4th 793, 798.)  Because the relevant facts here are undisputed and the question is whether Code of Civil Procedure section 998 applied, we review the trial court's costs award de novo.  (*Barella*, at p. 797.)  We uphold the trial court's decision if it was correct under any theory of law "regardless of the considerations that moved the lower court to its conclusion."  (*Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 568.)

T&R contends that its offer to settle the cross-complaint for $15,001 and TBD's failure to recover anything on its dismissed cross-complaint triggered cost-shifting provisions under Code of Civil Procedure section 998.  But a Code of Civil Procedure section 998 offer that requires the release of claims not involved in the litigation is invalid.  (*Ignacio v. Caracciolo* (2016) 2 Cal.App.5th 81, 86.)  " 'That limitation exists because of the difficulty in calculating whether a jury award is more or less favorable than a settlement offer when the jury's award encompasses claims that are not one and the same with those the offer covers.  [Citations.]'  [Citation.]  If the settlement offer includes 'terms or conditions, apart from the termination of the pending action in exchange for monetary consideration, that make it exceedingly difficult or impossible to determine the value of the offer to the plaintiff,' the offer is invalid under section 998."  (*Id.* at p. 87.)

Here, the settlement offer was not only for dismissal of the cross-complaint but also for "a general release of all claims," including a waiver of Civil Code section 1542, and a waiver of all

18

liens, known and unknown.  Because the offer was invalid under Code of Civil Procedure section 998, the cost-shifting provisions do not apply.

DISPOSITION

The judgment is affirmed.  Respondent shall recover its costs on appeal.

<u>NOT TO BE PUBLISHED.</u>

BALTODANO, J.

We concur:

YEGAN, Acting P. J.

CODY, J.

19

Mark S. Borrell, Judge

Superior Court County of Ventura

_____

Orland Law Group, James J. Orland; Law Offices of Adam C. Rapaport and Adam C. Rapaport; Benedon & Serlin, Melinda W. Ebelhar and Kelly R. Horwitz for Plaintiff and Appellant.

Law Offices of Patrick L. Garofalo and Patrick L. Garofalo for Defendant and Respondent.